1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   HEATHER BOONE and ROXANNE              No. 1:21-cv-00241-DAD-BAM
     RIVERA, on behalf of themselves and all
12   others similarly situated,

13                    Plaintiffs,            ORDER DENYING IN PART AND
                                             GRANTING IN PART DEFENDANT'S
14        v.                                 MOTION TO DISMISS

15   AMAZON.COM SERVICES, LLC,               (Doc. No. 24)

16                    Defendant.

17

18        This matter is before the court on the motion to dismiss filed by defendant Amazon.com

19   Services, LLC ("Amazon") on June 3, 2021. (Doc. No. 24.) Pursuant to General Order No. 617

20   addressing the public health emergency posed by the COVID-19 pandemic, defendant's motion

21   was taken under submission on the papers. (Doc. No. 27.) For the reasons explained below, the

22   court will deny in part and grant in part defendant's pending motion to dismiss.[1]

23   _____

24   [1] The undersigned apologizes for the excessive delay in the issuance of this order. This court's
     overwhelming caseload has been well publicized and the long-standing lack of judicial resources
25   in this district long-ago reached crisis proportion. That situation has now been partially addressed
     by the U.S. Senate's confirmation of a new district judge for this court on December 17, 2021.
26   Nonetheless, for over twenty-two months the undersigned was left presiding over approximately
     1,300 civil cases and criminal matters involving 735 defendants. Unfortunately, that situation
27   sometimes results in the court not being able to issue orders in submitted civil matters within an
     acceptable period of time, even as the undersigned works through the predictable backlog. This
28   has been frustrating to the court, which fully realizes how incredibly frustrating it is to the parties
     and their counsel.

1

**BACKGROUND**

2          On May 14, 2021, plaintiffs filed their first amended complaint ("FAC") in this putative

3   wage-and-hour class and collective action against their employer Amazon, for allegedly failing to

4   compensate employees for time spent undergoing COVID-19 symptom screenings before the

5   beginning of each of their shifts.  (Doc. No. 23.)  On January 14, 2022, the parties stipulated to

6   allow plaintiffs to file a second amended complaint ("SAC"), which plaintiffs filed that same day.

7   (Doc. Nos. 35, 36.)  The only difference between plaintiffs' FAC and SAC is that plaintiffs' SAC

8   includes additional California Labor Code Private Attorneys General Act ("PAGA") claims.

9   (Doc. No. 35 at 2.)  However, the parties agree that "to the extent the Court holds that an asserted

10  Labor Code violation has not been sufficiently alleged and is therefore subject to dismissal, then

11  the PAGA claims shall also be deemed to not have been sufficiently alleged[.]"  (*Id.* at 3.)  The

12  parties also have stipulated that defendant's original motion to dismiss (Doc. No. 24)—filed in

13  response to the FAC—shall still constitute defendant's responsive pleading to the SAC, and

14  neither party offers additional arguments with respect to that motion.  (*Id.* at 2.)  Accordingly, the

15  court will treat defendant's original and pending motion (Doc. No. 24) as seeking dismissal of the

16  SAC.

17         In their SAC, plaintiffs allege as follows.  Amazon operates fulfillment centers across the

18  country.  (Doc. No. 36 at ¶ 25.)  These fulfillment centers are the warehouses where Amazon

19  stores packages that are delivered to customers.  (*Id.*)  Hundreds of Amazon employees work at

20  each of these centers.  (*Id.*)

21         Plaintiff Heather Boone, a resident of Kerman, California, and plaintiff Roxanne Rivera, a

22  resident of Atwater, California, worked as hourly, non-exempt employees at Amazon's

23  fulfillment centers.  (*Id.* at ¶¶ 10, 11, 26, 27.)  Plaintiff Boone worked at the fulfillment center in

24  Fresno, and her job duties included gathering packages from the Amazon warehouse, scanning

25  them, placing them in boxes, and labeling the items.  (*Id.* at ¶ 26.)  She normally worked four

26  days per week and her normal shift was eight to ten hours on average.  (*Id.*)  Plaintiff Rivera

27  worked at Amazon fulfillment centers in Patterson and Tracy, California, from approximately

28  6:00 p.m. to 5:00 a.m. for four consecutive days, followed by three days off.  (*Id.* at ¶ 27.)  At the

1   Tracy facility, plaintiff Rivera's duties included gathering items from the shelves in the
2   warehouses and putting them in carts, and at the Patterson facility, her duties similarly included
3   gathering items and placing them in the right location in the warehouse.  (*Id.*)  As hourly, non-
4   exempt employees, plaintiffs were required to clock-in and clock-out each day.  (*Id.* at ¶ 28.)

5          Following the outbreak of the COVID-19 virus, Amazon implemented a company-wide
6   policy requiring each of its hourly, non-exempt employees to undergo a physical and medical
7   examination to check for symptoms of the virus before starting each shift.  (*Id.* at ¶ 24.)  Pursuant
8   to this policy, prior to clocking in each day, plaintiffs were required to undergo a COVID-19
9   screening.  (*Id.*)  Amazon employed two methods in performing the screening.  (*Id.* at ¶ 30.)  In
10  the first method, which was employed at its Tracy location, the Amazon employee approached a
11  security booth, swiped their badge to confirm they were an employee of Amazon, and were then
12  asked a series of questions.  (*Id.*)  Those questions included:  (1) whether they have been exposed
13  to others who have COVID-19; (2) whether they are currently experiencing symptoms of
14  COVID-19, such as runny nose or shortness of breath; and (3) whether they have a face mask to
15  wear.  (*Id.*)  If the employee successfully cleared this first examination, the employee then walked
16  to a second checkpoint.  (*Id.* at ¶ 31.)  There, the employee was subject to a body temperature
17  scan to determine whether they had a fever.  (*Id.*)  If the employee passed this second
18  examination, the employee was then allowed to clock-in for the day.  (*Id.*)

19         In the second screening method employed by Amazon, the employees were required to
20  form a line at the entrance to the facility and were then called one-by-one to a checkpoint where
21  the COVID-19 screening took place.  (*Id.* at ¶ 32.)  This screening process involved another
22  Amazon employee taking the temperature of each employee whose shift was about to start and
23  asking a series of questions related to their health, such as whether they were having trouble
24  breathing, were coughing, had a runny nose, or were experiencing chest pain.  (*Id.*)  The
25  employees were also asked questions such as whether they had travelled recently or whether they
26  had been exposed to someone infected with COVID-19.  (*Id.*)  If the employee passed this
27  examination, they were provided a mask to wear at work.  (*Id.*)
28  /////

Under either screening method, if an employee did *not* initially pass the screening examination, that employee was moved to another section of the facility where a further examination occurred, and there the employee was asked a series of follow-up questions to identify whether that employee currently was exhibiting symptoms of COVID-19 and therefore posed a potential health hazard to the facility. (*Id.* at ¶ 33.) If the employee passed this second stage examination, the employee was then given a face mask and was allowed to clock-in to work their shift for the day. (*Id.*) If an employee did not pass this second stage examination, that employee was not permitted to work that day. (*Id.*) The amount of time it took to undergo the COVID-19 screening examinations was approximately 10–15 minutes on average. (*Id.* at ¶ 34.) However, this amount of time could be longer depending upon the number of other Amazon employees in line for the COVID-19 screening. (*Id.*) Although the examination was conducted on the premises of Amazon, was required by Amazon, and was necessary in order for each employee to perform his or her work for the day, Amazon refused to pay employees for the time they spent undergoing these COVID-19 symptom screenings. (*Id.* at ¶¶ 36–38.)

According to plaintiffs, the COVID-19 screening examinations constitute compensable time that was worked by plaintiffs and the putative class members that plaintiffs seek to represent, comprised of: "All current and former hourly paid employees of Amazon who underwent a COVID-19 screening during at least one week in California in the four-year period before the filing of the Original Complaint to final resolution of this Action." (*Id.* at ¶¶ 1, 57.) In particular, plaintiffs and the putative class members were required to follow Amazon's instructions and were confined to Amazon's premises while awaiting and during the COVID-19 screening. (*Id.* at ¶¶ 36, 37.) Plaintiffs assert that through the screening process, Amazon directs, commands, and retrains its employees; prevents them from using that time effectively for their own purposes; and that the employees remain subject to Amazon's control during the COVID-19 examination. (*Id.* at ¶ 39.)

According to plaintiffs, the screenings were necessary to the principal work performed by plaintiffs and the putative class members because they were necessary to ensure a safe workplace. (*Id.* at ¶ 42.) Moreover, plaintiffs assert that the screenings were undertaken primarily for the

4

1  benefit of Amazon.  (*Id.*)  It is plaintiffs' understanding and belief that Amazon required its

2  employees to undergo this COVID-19 screening procedure for the purposes of overall safety in

3  the facilities and to prevent the employees from inadvertently infecting the Amazon facilities or

4  even Amazon products, which could in turn potentially infect customers.  (*Id.* at ¶ 43.)  In that

5  event, Amazon's business would be disrupted, and the plaintiffs and putative class members

6  would not be able to perform their work.  (*Id.* at ¶ 45.)  Plaintiffs contend that in light of

7  Amazon's failure to pay employees for the time spent undergoing these screenings, Amazon has

8  violated both California and federal law and the class members are owed significant unpaid

9  wages.  (*Id.* at ¶ 47–48.)

10      Specifically, plaintiffs assert that Amazon's conduct violates California law because

11  Amazon failed to pay for all hours worked by its employees, failed to pay overtime wages, and

12  failed to provide itemized wage statements as required by the California Labor Code and

13  California Industrial Wage Commission Wage Orders.  (*Id.* at ¶ 2.)  Moreover, plaintiffs also file

14  this action to recover civil penalties on behalf of the State of California and Aggrieved Employees

15  under California Labor Code § 2699, or the PAGA.  (*Id.* at ¶ 3.)  Lastly, plaintiffs allege that

16  Amazon's conduct also violates the Fair Labor Standards Act ("FLSA"), which requires non-

17  exempt employees to be compensated for all hours worked in excess of forty hours in a

18  workweek at one and one-half times their regular rate of pay.  (*Id.* at ¶ 4) (citing 29 U.S.C. §

19  207(a)).  Plaintiffs seek to represent a FLSA collective comprised of "all current and former

20  hourly paid employees of Amazon who underwent a COVID-19 screening during at least one

21  week in the three-year period before the filing of this complaint to the present."  (*Id.* at ¶¶ 12, 67.)

22      Based on these allegations, plaintiffs assert the following eight causes of action in their

23  SAC:  (1) failure to pay for all hours worked in violation of California Labor Code §§ 204, 1194,

24  1194.2, 1197, 1197.1, 1198; (2) failure to pay overtime wages in violation of California Labor

25  Code §§ 510, 558, 1194 and Wage Order No. 4–2001; (3) failure to furnish wage statements in

26  violation of California Labor Code § 226; (4) failure to pay all wages due upon separation in

27  violation of California Labor Code §§ 201, 202, 203, 218; (5) violation of California's Unfair

28  Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq.*; (6)

5

1  failure to pay overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et*

2  *seq.*; (7) for civil penalties pursuant to California Labor Code § 2699(a); and (8) penalties

3  pursuant to California Labor Code § 2699(f).  (*Id.* at 15–26.)

4  On June 3, 2021, defendant filed the pending motion to dismiss pursuant to Federal Rule

5  of Civil Procedure 12(b)(6), contending that plaintiffs had failed to state a cognizable claim.

6  (Doc. No. 24.)  On June 22, 2021, plaintiffs filed their opposition to the pending motion.  (Doc.

7  No. 28.)  On June 29, 2021, defendant filed a reply thereto.  (Doc. No. 30.)

8  **LEGAL STANDARD**

9  The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal

10  sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.

11  1983).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of

12  sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901

13  F.2d 696, 699 (9th Cir. 1990).  A claim for relief must contain "a short and plain statement of the

14  claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Though Rule 8(a)

15  does not require detailed factual allegations, a plaintiff is required to allege "enough facts to state

16  a claim for relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

17  (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).  "A claim has facial plausibility when the

18  plaintiff pleads factual content that allows the court to draw the reasonable inference that the

19  defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  In determining whether a

20  complaint states a claim on which relief may be granted, the court accepts as true the allegations

21  in the complaint and construes the allegations in the light most favorable to the plaintiff.  *Hishon*

22  *v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir.

23  1989).  It is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or

24  that the defendants have violated the . . . laws in ways that have not been alleged."  *Associated*

25  *Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

26  **DISCUSSION**

27  Defendant moves to dismiss each of plaintiffs' eight claims.  The court will address the

28  relevant arguments with respect to each claim in turn below.

6

1  **A.    Whether Plaintiffs Have Sufficiently Alleged That Time Spent in COVID-19**

2  **Screening Is Compensable "Hours Worked" Under California Law (Claim One)**

3         California law requires employers to pay their employees a minimum wage for all hours

4  worked.  *See* Cal. Code Regs. tit. 8 § 11070 (2001).  California regulations define hours worked

5  to mean "the time during which an employee is subject to the control of an employer, and

6  includes all the time the employee is suffered or permitted to work, whether or not required to do

7  so."  *Id.*  In determining whether certain time constitutes hours worked, "courts may and should

8  consider additional relevant factors—including, but not limited to, the location of the activity, the

9  degree of the employer's control, whether the activity primarily benefits the employee or

10  employer, and whether the activity is enforced through disciplinary measures[.]"  *Frlekin v. Apple

11  Inc.*, 48 Cal. 5th 1038, 1056 (2020); *see also Bono Enters., Inc. v. Bradshaw*, 32 Cal. App. 4th

12  968, 974–5 (1995) (interpreting "subject to the control of an employer" to mean "[w]hen an

13  employer directs, commands or restrains an employee.").  For example, in *Frlekin*, the California

14  Supreme Court held that the time spent by Apple retail store employees waiting for and

15  undergoing mandatory exit searches of their personal bags before leaving their employer's

16  premises was employer-controlled activity and therefore was compensable as "hours worked."  8

17  Cal. 5th at 1042–43.

18         In its pending motion to dismiss, defendant argues that the time spent in COVID-19

19  screenings does not constitute hours worked under California law and that plaintiffs' first claim

20  for failure to pay all wages due should therefore be dismissed.  (Doc. No. 24 at 23.)  Defendant

21  argues that the screening "is not primarily for Amazon's benefit, it is required by California

22  regulations . . ., and it takes place before employees fully enter onto the work premises."  (*Id.* at

23  24.)  With respect to the first point, defendant asserts that it does not implement the COVID-19

24  screenings to advance a particular business interest.  (*Id.*)  Rather, it states "Amazon has done its

25  part to advance a nationwide public health initiative directed by government authorities and

26  designed to produce benefits common to everyone."  (*Id.*)  In other words, defendant contends

27  that its COVID-19 screening procedures are intended to comply with the applicable government

28  policies and are therefore not primarily intended to benefit it as an employer.  (*Id.* at 25.)  Next,

1    defendant advances the argument that it does not exercise control over its employees (whom

2    defendant refers to as "Amazon associates") during the screenings because the "alleged

3    screenings occur before associates' shifts and before they fully enter the worksite." (*Id.*)

4    Defendant seeks to deflect any comparison to the California Supreme Court's recent decision in

5    *Frlekin* by arguing that Amazon's COVID-19 screenings are designed to advance public health

6    objectives whereas the screenings at issue in *Frlekin* promoted the employer's goal to detect and

7    deter theft. (*Id.* at 25–26) (citing *Frlekin*, 8 Cal. 5th at 1052–56). Defendant also notes that the

8    COVID-19 screenings at issue here occur at the beginning of the workday, whereas the

9    screenings in *Frlekin* took place at the end of the workday and workers were not permitted to

10   leave the worksite until undergoing the screening. (*Id.* at 26.) This argument appears to be based

11   on the contention that Amazon employees are not confined to the premises nor are they under

12   Amazon's control until after they pass through the COVID-19 screening. Lastly, defendant

13   acknowledges that the California Department of Industrial Relations ("DIR") posted a FAQ

14   online in July 2020 in which the DIR stated that "[e]mployers that require their workers to

15   complete a medical check in order to begin a shift, even if it is recommended under public health

16   orders, must compensate workers for that time worked." (*Id.* at 26–27.) Nonetheless, defendant

17   argues that this guidance is not legally binding and is entitled to little, if any, weight because the

18   DIR's analysis of this legal question is "both cursory and erroneous" in light of California

19   Supreme Court precedent. (*Id.*) Defendant therefore urges this court to find that time spent by

20   employees in COVID-19 screenings is not compensable time under California law and to dismiss

21   plaintiffs' first claim. (*Id.*)

22          In their opposition to the pending motion, plaintiffs rely primarily on the decision in

23   *Frlekin* and argue that like the employer Apple, which exercised control over employees during

24   baggage checks, here Amazon similarly exercises control because it "directs, commands, and

25   retains its employees during the COVID-19 examination; prevents them from using that time

26   effectively for their own purposes; and [requires them to] remain subject to Amazon's control

27   during the examination." (Doc. No. 28 at 10.) Plaintiffs also emphasize the guidance issued by

28   the DIR, stating that employers must compensate their employees for time spent in COVID-19

8

screenings.  (*Id.*)  While plaintiffs recognize that the DIR guidance is not binding on this court, they nevertheless argue that "these opinions by DIR 'do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'"  (*Id.*) (citing *Seymore v. Metson Marine, Inc.*, 194 Cal. App. 4th 361, 369 n.5 (2011)).  Plaintiffs further argue that the COVID-19 screenings are, in fact, primarily for Amazon's benefit because "[t]he screenings ensured that there was no disruption in Amazon's business operations, enabling Amazon to continue to earn billions in profits."  (*Id.* at 14.)  Lastly, plaintiffs contend that they were under the control of defendant because they were confined to the premises during the screenings, they were required to follow Amazon's instructions while awaiting and during the screenings, and they were compelled to perform specific tasks during the examination at the risk of being fired if they refused.  (*Id.* at 14–15.)

In its reply, defendant again emphasizes that the factual situation addressed by the California Supreme Court in *Frlekin* is distinguishable from that alleged by plaintiffs in this case because in *Frlekin* "the exit security screenings' purpose was to detect and deter theft of the employer's property, which is primarily in the employer's interest."  (Doc. No. 30 at 15–16.)  Defendant asserts that, in contrast, because the COVID-19 screenings at issue here are a part of a nationwide public health effort and are for the benefit of associates and the community at large, they cannot be primarily for defendant's benefit.  (*Id.* at 16.)  Moreover, defendant notes that in *Frlekin* the "screenings were invasive, requiring employees to open their bags and present items for inspection under Apple's close supervision and direction."  (*Id.*) (citing *Frlekin*, 8 Cal. 5th at 1047).  In contrast, defendant contends that the screenings at issue in this case take place at the beginning of a shift, are non-invasive, and the associates' involvement "is entirely passive, unlike Apple's bag check process."  (*Id.*)  Defendant also repeats its argument that the DIR's guidance in this area is cursory and entitled to little weight.  (*Id.* at 17.)

The court is not persuaded by defendant's arguments in this regard.  Based on the allegations in the SAC, the court concludes that this case falls squarely within the parameters of the decision in *Frlekin*.  In *Frlekin*, the California Supreme Court engaged in an in-depth analysis to determine what constitutes compensable work under California law.  *Frlekin*, 8 Cal. 5th 1038.

1    The court focused its inquiry on whether Apple employees were subject to their employer's

2    control.[2]  *Id.*  Specifically, the court held that "an employee who is *subject to the control* of an

3    employer does not have to be working during that time to be compensated under the applicable

4    wage order."  *Id.* at 1046.  The court also emphasized that "whether an activity is required

5    remains probative in determining whether an employee is subject to the employer's control . . .

6    [but] that courts may and should consider . . . the location of the activity, the degree of the

7    employer's control, whether the activity primarily benefits the employee or employer, and

8    whether the activity is enforced through disciplinary measures[.]"  *Id.* at 1056.  Although the

9    California Supreme Court in *Frlekin* listed a number of factors to be considered in making this

10   determination, it appears clear under the decision that an employer is much more likely to be

11   found to be exercising control when the disputed act is required on the part of employees.  *See,*

12   *e.g.*, *Frlekin*, 8 Cal. 5th at 1054 ("We agree with the Ninth Circuit.  Based on our review of the

13   record, it is obvious that Apple's exit searches are, as a practical matter, required."); *see also*

14   *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 586 (2000) ("We also reject [defendant's]

15   contention that plaintiffs were not under its control during the required bus ride because they

16   could read on the bus, or perform other personal activities.").  Indeed, the main argument

17   advanced by Apple in *Frlekin* appears to have been that employees were not required to undergo

18   bag searches because they were not required to bring bags to work.  *Frlekin*, 8 Cal. 5th at 1054–

19   55.  The California Supreme Court rejected that argument, finding that "Apple's exit searches are,

20   as a practical matter, required" given that employees had little choice but to bring a bag to work

21   each day.  *Id.*  Thus, whether an employee is required to participate in the activity appears to be

22   the most crucial factor in determining control by the employer.

23          Nonetheless, below the court will address all of the factors listed by the California

24   Supreme Court in *Frlekin*, since they each remain relevant to the determination of whether

25   employees are subject to the employer's control for purposes of their compensation.

26   _____

27   [2]  The California Supreme Court noted that there are two tests for determining whether certain
     time is compensable as hours worked:  the control test and the "suffered or permitted to work"

28   test.  8 Cal. 5th at 1057.  In *Frlekin*, that court addressed only the former test.

First, in the pending action, plaintiffs allege that they were "required to follow Amazon's instructions while awaiting and during the COVID-19 screening" and that "Amazon required every employee to complete the COVID-19 screening and it was not optional."  (SAC at ¶ 36.)  Thus, plaintiffs have adequately alleged they were required to be screened.  Second, plaintiffs allege that they "were confined to the premises of Amazon when they waited for and during the examination."  (*Id.* at ¶ 37.)  Plaintiffs have therefore adequately alleged that the required activity took place on Amazon property.  Defendant's assertion that "Amazon associates are 'not confined to the premises until' the COVID-19 screening" (Doc. No. 24 at 26) has no bearing on the court's conclusion in this regard because in ruling on defendant's motion to dismiss, the court must accept as true plaintiffs' allegations that they were confined to Amazon's premises while awaiting their COVID-19 screenings.  Third, plaintiffs have alleged that they must comply "under threat of discipline, including possible termination."  (SAC at ¶ 36.)  In this way, plaintiffs have adequately alleged that the activity is enforced through disciplinary measures.  Fourth, plaintiffs allege that the screenings were necessary "to ensure that the virus did not disrupt the work performed by the Plaintiffs and Class Members or affect the business operations of Amazon."  (*Id.* at ¶¶ 44–45.)  Although the court recognizes that the employees and customers may derive some benefit from Amazon's implementation of COVID-19 screenings of its employees because those procedures are designed to limit the spread of the virus throughout its fulfillment centers, the court concludes that plaintiffs have nonetheless adequately alleged that Amazon is the primary beneficiary of its policy, certainly sufficiently to survive a motion to dismiss.  Just as theft prevention in *Frlekin* was found by the California Supreme Court to be for Apple's primary benefit, so too is the COVID-19 screening plausibly alleged to be for Amazon's own benefit.  Each employer plausibly acted with a motivation of preventing lost profits:  Apple from stolen products and Amazon from infected products and staff shortages due to COVID-19 infection.

In addition, in moving to dismiss the complaint, Amazon's argument that its screening policies are government mandated and thus not employed for its benefit is not particularly persuasive.  Indeed, the DIR guidelines specifically state that time completing a screening constitutes time worked "even if such tasks were performed pursuant to a state or local public

health guideline[.]"  (Doc. No. 26-10 at 6.)  The court disagrees with defendant's contention that the DIR guidance is unsupported and contrary to California law.  The DIR guidelines provide that the term "hours worked" means "the time during which a worker is subject to the control of an employer[.]"  (Doc. No. 26-10 at 6.)  This is in line with the precedent set out by the California Supreme Court in *Frlekin*.  While defendant characterizes the DIR guidelines as "cursory" and "erroneous," those guidelines do not appear to be inconsistent with the California Supreme Court's decision in *Frlekin*.  Moreover, as plaintiffs note in their opposition to the pending motion, California courts have often looked to these guidelines, even though they are not legally binding, because they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Seymore*, 194 Cal. App. 4th at 369 n.5 (citations omitted) (citing to DIR Division of Labor Standards Enforcement advisory guidelines for support).

In sum, the court concludes that plaintiffs have sufficiently alleged that they were subject to defendant's control while they spent time awaiting and undergoing the COVID-19 screening checks—time that constitutes "hours worked" under California law.  Accordingly, the court will deny defendant's motion to dismiss plaintiffs' first claim based upon the alleged failure to pay for all hours worked under California Labor Code §§ 204, 1194, 1194.2, 1197, 1197.1, 1198.

**B.**     **Whether Plaintiffs Have Sufficiently Alleged Their FLSA and State Law Claims for Failure to Pay Overtime (Claims Two and Six)**

Defendant similarly argues that time spent in COVID-19 screenings is not compensable under the FLSA and that plaintiffs' sixth claim for failure to pay overtime in violation of the FLSA should therefore be dismissed.  (Doc. No. 24 at 15.)  In addition, defendant argues that plaintiffs' FLSA overtime claim is subject to dismissal because plaintiffs have failed to allege facts sufficient to state a cognizable overtime claim generally.  Because the same pleading standards apply for unpaid overtime claims under the FLSA and California law, defendant argues that plaintiffs' second claim for failure to pay overtime in violation of the California Labor Code should likewise be dismissed for failure to state a cognizable claim.

/////

1        1.      Whether Time Spent in COVID-19 Screenings is Compensable Under the FLSA

2        Courts in the Ninth Circuit apply a three-step inquiry to determine whether an activity

3   should be compensated under the FLSA.  *See Alvarez v. IBP, Inc.*, 339 F.3d 894, 902–03 (9th Cir.

4   2003); *see also Ceja-Corona v. CVS Pharmacy, Inc.*, No. 1:12-cv-01868-AWI-DLB, 2013 WL

5   796649, at *4 (E.D. Cal. Mar. 4, 2013).  "The three steps are (1) whether the activity constituted

6   'work,' (2) whether the activity was an 'integral and indispensable' duty, and (3) whether the

7   activity was *de minimis*."  *Ceja-Corona*, 2013 WL 796649, at *4 (citing *Bamonte v. City of Mesa*,

8   598 F.3d 1217, 1224 (9th Cir. 2010)).

9            a.      *Whether COVID-19 Screenings Constitute "Work" Under the FLSA*

10       In determining whether an activity constitutes work under the FLSA, courts apply a two-

11  prong test.  First, the court must determine whether the alleged activity is controlled or required

12  by the employer.  *Bamonte*, 598 F.3d at 1224–25.  Second, the court must determine whether the

13  activity is pursued necessarily and primarily for the benefit of the employer.  *Id.*

14       In its pending motion, defendant argues that "COVID-19 screenings do not satisfy this test

15  because they are not conducted primarily for Amazon's benefit."  (Doc. No. 24 at 16.)  According

16  to defendant, the screenings benefit Amazon associates "by detecting whether they are ill and in

17  need of medical attention, as well as by preventing associates from putting their colleagues at

18  risk."  (*Id.* at 17.)  Defendant thus concludes that employees, and the general public, would suffer

19  from a COVID-19 outbreak to the same extent that defendant would.  (*Id.*)  Because the virus

20  screenings benefit Amazon associates and the public at large, defendant contends that those

21  screening are not undertaken by Amazon *primarily* for its benefit.  (*Id.*)  Defendant essentially

22  argues that screenings meant to address broader public health concerns transcend its own business

23  interests.  (*Id.* at 18.)

24       In their opposition to the pending motion, plaintiffs counter that because defendant's

25  COVID-19 screening policy is intended to keep its fulfillment centers as safe of a workplace as

26  possible given the circumstances of the global pandemic, that policy primarily benefits defendant.

27  (Doc. No. 28 at 17.)  Plaintiffs cite several cases in support of their position in this regard.  As

28  one such example, plaintiffs point to the Supreme Court decision in *Steiner v. Mitchell*, 350 U.S.

247 (1956).  (Doc. No. 28 at 16–17.)  In *Steiner*, the Supreme Court held that time spent washing

off chemicals produced from the battery manufacturing process directly benefited the employer

because it made "the plant as safe a place as is possible under the circumstances," which

increased the efficiency of the plant's operation.  *Steiner*, 350 U.S. at 251–52.  Plaintiffs also cite

the decision in *Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003), in which the Ninth Circuit held

that the time spent by meat packing employees donning, doffing, and washing their protective

gear primarily benefited the employer.  (Doc. No. 28 at 17.)  Plaintiffs contend that the facts in

their case are comparable to those confronted by the courts in *Steiner* and *Alvarez* because the

screenings "were (1) designed to make the workplace safe and thereby increase the efficiency of

Amazon's operations, (2) were for the safety of the workers and their families, and (3) were to

ensure that Amazon complied with the law."  (*Id.* at 17–18.)  Plaintiffs conclude that "[h]aving

business operations continue without interruption undoubtedly increases the profits of Amazon . .

.[,] complying with all laws ensures Amazon can continue to operate and earn profits . . .[,] [and]

having employees who are healthy and able to perform the work ensures that Amazon can operate

efficiently, and thereby, earn profits."  (*Id.* at 18–19.)

   In its reply, defendant repeats its contention that although the screenings "incidentally

benefit Amazon, they first and foremost benefit its associates and, indeed, the community as a

whole."  (Doc. No. 30 at 8.)  Defendant also argues that the decisions in *Steiner* and *Alvarez* are

not applicable here because "both cases chiefly concerned whether an activity was 'preliminary'

or 'postliminary' to the workers' principal activities[.]"  (*Id.* at 9.)  Lastly, defendant asserts that

the job-specific conditions of meatpacking workers and workers at a car battery manufacturer

plant required specialized equipment and involved more dangerous situations that "are a far cry

from COVID-19 screening, which is a measure recommended by the CDC and the State of

California . . . for all industries for the safety of the individuals screened and the community as a

whole[.]"  (*Id.*)

   First, for the reasons articulated above, plaintiffs have sufficiently alleged that the

COVID-19 screenings are both required and controlled by defendant.  Second, plaintiffs have

sufficiently alleged that the COVID-19 screening policy primarily benefits defendant.  The court

14

1  is not persuaded by defendant's argument that it is only an incidental beneficiary of the

2  screenings because every other member of the community likewise benefits from the prevention

3  of infection.  (Doc. No. 30 at 9–10.)  While, of course, the community at large benefits from

4  COVID-19 precautions—such as mass testing, vaccinations, masking, and social distancing

5  measures—plaintiffs have sufficiently alleged that the specific screenings undertaken at the

6  Amazon facilities benefit defendant overall more so than its employees or the public, i.e., the

7  policy *primarily* benefits defendant.  The screenings allegedly "ensure that the virus [does] not

8  disrupt the work performed by the Plaintiffs . . . or affect the business operations of Amazon."

9  (SAC at ¶ 44.)  According to the allegations of the SAC, absent the screenings, "workers could

10  inadvertently or unintentionally bring the virus into the Amazon facilities causing a mass

11  breakout of the virus infecting hundreds to thousands of other workers of Amazon."  (*Id.*)  If

12  Amazon facilities suffered an infection outbreak, defendant would potentially have to find new

13  employees or shut down its warehouse until it was safe to open again.  Such an outbreak would

14  harm defendant Amazon directly and to a greater extent than the general public.  Given this

15  alleged substantial risk to defendant and its business operations, it is plausibly alleged that it is

16  defendant who primarily benefits from its decision to mitigate that risk by implementing the

17  mandatory COVID-19 screening policy. [3]

---

18  [3]  The court has reviewed the legal authority cited by defendant in support of its argument that its
19  COVID-19 screening policy is not primarily for its benefit and finds the cited cases to be
   inapplicable and/or distinguishable.  For example, defendant cites the decision in *Wheat v. J.B.*
20  *Hunt Transp., Inc.*, No. 15-cv-02849-MWF-AS, 2016 WL 1397673, at *4 (C.D. Cal. Apr. 5,
   2016).  In that case, the district court held that the time employee truck drivers spent on sleep
21  apnea testing did not constitute "work" under the FLSA because the benefit to the employer of
   having healthy drivers minimizing the risk of road accidents was merely incidental.  *Id.* at *4.
22  However, the district court in *Wheat* emphasized that there was no indication that the defendant
   was short-staffed such that it needed drivers suffering with sleep apnea to operate its trucks.
23  *Wheat*, 2016 WL 1397673, at *4.  Here, on the other hand, plaintiffs have alleged that Amazon
   would not be able to operate were its employees to suffer a mass infection from COVID-19.
24  (SAC at ¶ 44.)  Additionally, the decision in *Wheat* noted that the intended beneficiary of the
   testing in question there was the employee because she "hoped to improve her health in order to
25  become qualified to drive commercial trucks."  *Wheat*, 2016 WL 1397673, at *4.  Here, it is not
   as if plaintiffs underwent the COVID-19 screenings to somehow improve their qualifications to
26  work for Amazon.  Moreover, the screenings at issue here were required of all employees, not just
27  those who did not otherwise meet medical standards like the plaintiff in *Wheat* with her sleep
   apnea disorder.  Defendant also cites the decision in *Bonilla v. Baker Concrete Construction, Inc.*,
28

15

1   For the reasons explained above, the court concludes that plaintiffs have adequately

2   alleged that the COVID-19 screenings constituted "work" under the FLSA.

3   　　　　　　　　　b.　　*Whether COVID-19 Screenings Are Integral and Indispensable to the*

4   　　　　　　　　　　　　*Principal Activities Performed by the Plaintiffs*

5   　　　　A work-related activity is not compensable unless it is integral and indispensable to

6   principal activities. *Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 35 (2014).  What is

7   considered integral and indispensable is context specific.  *See Alvarez*, 339 F.3d at 902.  "[A]n

8   activity is not integral and indispensable to an employee's principal activities unless it is an

9   intrinsic element of those activities and one with which the employee cannot dispense if he is to

10  perform those activities." *Busk*, 574 U.S. at 35.  In *Busk*, the employer required its employees—

11  warehouse workers who retrieved inventory and packaged it for shipment—to undergo an

12

-------------------------------------------------------------------

13  487 F.3d 1340 (11th Cir. 2007).  (Doc. No. 30 at 9.)  In that case the circuit court held that
    construction workers at Miami International Airport were not engaging in compensable work
14  when they went through security screenings mandated by the Federal Aviation Administration
    (FAA).  *Bonilla*, 487 F.3d at 1345.  That decision does not support the granting of defendant's
15  motion to dismiss in this case.  First, the decision in *Bonilla* applied the primary benefit test in
    determining whether the screenings were integral and indispensable (step two in the three-step
16  inquiry to determine whether an activity should be compensated under the FLSA), not in
    analyzing whether the screenings constituted "work" (step one of the three-step inquiry).  *Id.* at
17  1344.  Moreover, at the time *Bonilla* was decided by the Eleventh Circuit, the Ninth Circuit had
    established a contradictory test with respect to deeming an activity integral and indispensable.  In
18  *Ballaris*, the Ninth Circuit had held as to the integral and indispensable test that "'where the
    changing of clothes on the employer's premises is *required by law*, by rules of the employer, or
19  by the nature of the work,' the activity may be considered integral and indispensable to the
    principal activities." *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir. 2004)
20  (emphasis added).  Nevertheless, even assuming the legal analysis undertaken in *Bonilla* were
    applicable here, the facts in that case differ in key respects from those alleged by plaintiff here.
21  In *Bonilla*, the court stated that the construction company did not stand to benefit from their
    employees undergoing a security screening required by the FAA.  *See Bonilla*, 487 F.3d at 1344.
22  That conclusion was based on the fact that the screening at issue was aimed at searching for
    weapons, explosives, or incendiaries.  *See id.*  Thus, screening to prevent an attack on the airport
23  had no clear nexus to the company's construction work.  Here, of course, the COVID-19
    screening is tied to a once in a generation pandemic.  Infections from COVID-19 have been
24  rampant, and a single infected employee could easily result in the infection of his or her
    coworkers.  Infection among employees would directly impact defendant's operations and profits,
25  evidencing a clear nexus between the common spread of COVID-19 and Amazon's work.
    Accordingly, the facts alleged in this case are distinguishable from those in *Bonilla*, where the
26  purpose of the employee screening was far removed from the goals of the employer.
27

28

antitheft security screening before leaving work each day. *Id.* at 29. The Supreme Court considered whether the screenings were integral and indispensable to the employees' principal activities. *Id.* at 33. The Supreme Court held that the screenings were not integral and indispensable because the screenings were not intrinsic elements of retrieving products from warehouse shelves and the employer could have eliminated the screenings without impairing the employees' ability to complete their work. *Id.* at 35. Rather, the Supreme Court concluded that the security screenings were "preliminary" or "postliminary" activities, which were not compensable under the FLSA. *Id.* at 34–35. Citing U.S. Department of Labor ("DOL") regulations and its prior decision in *Steiner*, 350 U.S. at 249–51, the Supreme Court noted, however, that the time spent by an employee in a chemical plant changing clothes "would be compensable if he 'c[ould not] perform his principal activities without putting on certain clothes' but would not be compensable if 'changing clothes [were] merely a convenience to the employee and not directly related to his principle activities." *Id.* at 34 (citing 29 CFR § 790.8(c)). Notably, the Supreme Court also pointed out that the DOL regulations explain that "'when performed under the *conditions normally present*,' activities including 'checking in and out and waiting in line to do so, changing clothes, washing up or showering, and waiting in line to receive pay checks'" are preliminary or postliminary. (*Id.*) (citing 29 CFR § 790.7(g)) (emphasis added).

In its pending motion to dismiss, defendant argues that undergoing COVID-19 screenings is not integral and indispensable to gathering packages from the Amazon warehouse. (Doc. No. 24 at 18.) According to defendant, "Amazon's COVID-19 screening is 'preliminary' because it is not intrinsically tied to the primary activity for which the worker is employed and associates' jobs could be performed without the screening." (*Id.* at 19.) Moreover, defendant asserts that COVID-19 screenings are a "general precaution required by the State of California for nearly all employers" and "[s]uch generalized screening procedures are not tied to or dictated by the principal activities fulfillment center associates are employed to perform." (*Id.*) (citing *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 593–94 (2d Cir. 2007)). Lastly, defendant argues that "the fact that a given activity may be necessary to promote on-the-job safety is not dispositive /////

17

1   regarding compensability."  (*Id.* at 21) (citing *Dinkel v. MedStar Health Inc.*, 99 F. Supp. 3d 37,

2   41–42 (D.D.C. 2015)).

3          In their opposition to defendant's motion to dismiss, plaintiffs argue that the COVID-19

4   screenings "were necessary to ensure that the Amazon workers could perform their work safely,

5   to prevent contamination from the virus, and to keep the customers of Amazon safe."  (Doc. No.

6   28 at 19–20.)  Plaintiffs contend that if an employee became infected with COVID-19, they

7   would not be able to provide their services to defendant.  (*Id.* at 20.)  Plaintiffs additionally point

8   out that if Amazon customers "received packages that were infected with the virus, the customers

9   would likely no longer use Amazon's services."  (*Id.*)  Plaintiffs distinguish the COVID-19

10  screening at issue in this case from the exit screening at issue in *Busk*, which screening "did not

11  have anything to do with the workers' ability to do their jobs."  (*Id.* at 21.)  Plaintiffs assert that

12  here "the COVID-19 [screening] was necessary for the Plaintiffs to perform their work for

13  Amazon" and without the screening, plaintiffs' ability to perform their jobs "would have been

14  compromised."  (*Id.*)  Plaintiffs also cite recent guidance issued by the DOL, which provides that

15  time spent in the COVID-19 screenings should be compensated by employers.  (*Id.* at 21.)

16  Specifically, plaintiffs quote the DOL as stating:  "For many employees, undergoing a

17  temperature check before they begin work must be paid because it is necessary for their jobs."

18  (*Id.*)  Plaintiffs reject defendant's suggestion that these COVID-19 screenings are not integral to

19  the work plaintiffs do merely because screenings are uniform across many industries.  (*Id.* at 24.)

20  Rather, plaintiffs note that "the majority of the workers in the country have been working

21  remotely since the height of the pandemic.  They do not get screened for COVID-19 daily.

22  Instead, they perform their duties via the internet from home."  (*Id.*)  Ultimately, plaintiffs argue

23  that employers "have a non-delegable duty to provide a safe workplace for their employees and

24  the time spent by workers donning and doffing safety gear to ensure that the worker can safely

25  perform his/her work has routinely been held to be compensable under the FLSA."  (*Id.* at 24–

26  25.)

27          In its reply, defendant argues that "[e]ven where a pre-shift screening is done to ensure

28  employee safety, it is not compensable if it is not integral and indispensable to the employees'

18

principal activities." (Doc. No. 30 at 10) (citing *Busk*, 574 U.S. at 35–36). In defendant's view, plaintiffs here do the same tasks as the plaintiffs in *Busk*, i.e., retrieving products from warehouse shelves and packaging those products for shipment to Amazon customers. (*Id.*) Thus, defendant concludes that as with the security screening in *Busk*, "the alleged COVID-19 screening is not an intrinsic element of picking and packaging items, nor is screening indispensable to picking and packaging." (*Id.* at 10–11.) Defendant also emphasizes that the government screening recommendations are not limited to employees and workplaces, noting that childcare centers must screen staff and children. (*Id.*) Defendant then distinguishes the donning and doffing cases cited by plaintiffs, arguing that the protective gear those workers wore was "job-related and tied directly to the work tasks they performed," unlike the screening at issue here. (*Id.*) More, defendant counters plaintiffs' assertion that an activity is compensable if it is "necessary to ensure that the . . . workers would perform their work safely" by noting how that purported test was not adopted by the majority in *Busk*, but rather was drawn from Justice Sotomayor's concurrence. (*Id.* at 12.) Lastly, defendant contends that the DOL guidance is not entitled to deference and has little persuasive force in comparison to *Busk*. (*Id.*) Nonetheless, defendant hedges that contention, arguing that even if the DOL guidance controlled, the "DOL stated that many (but not all) employees might be owed compensation for screenings" and the example provided by the DOL—a nurse who performs direct patient care services—is health-oriented, whereas "COVID-19 screenings for Amazon associates are in no way a function of or directly related to the particular job duties they perform." (*Id.* at 13.)

The court is not persuaded by defendant's argument in support of its motion to dismiss that the COVID-19 screenings are not integral and indispensable to employees' work at the fulfillment centers. As stated above, the Supreme Court has explained that "'when performed under the *conditions normally present*,' activities including 'checking in and out and waiting in line to do so, changing clothes, washing up or showering, and waiting in line to receive pay checks'" are preliminary or postliminary. *Busk*, 574 U.S. at 35 (citing 29 CFR § 790.7(g)) (emphasis added). Of course, the COVID-19 screening at issue here is not in response to "conditions normally present" because it is in response to a once in a generation pandemic. As

19

alleged, the screenings at issue in this case are activities "with which the employee cannot dispense if he is to perform" his principal activities.  *Id.* at 35.  Plaintiffs allege that they could not "skip the screenings altogether without the safety or effectiveness of their principal activities being substantially impaired."  *Id.* at 38 (J. Sotomayor concurring).  Although defendant asserts that the screenings could be eliminated altogether without impairing the employees' ability to complete their work (Doc. No. 24 at 19), the undersigned disagrees that the SAC as alleged compels defendant's assertion.  Based on the allegations of the SAC, the screenings prevent the COVID-19 virus from spreading throughout defendant's fulfillment centers and infecting employees and products.  (SAC at ¶ 45.)  While it is true that in *Busk* the Supreme Court concluded that Amazon could eliminate security screenings without impairing the employees' work, screenings meant to prevent theft are materially different from COVID-19 screenings that are meant to prevent the spread of a highly-contagious and deadly virus among employees.  Plaintiffs have plausibly alleged that foregoing the latter would substantially impair the workplace safety at the fulfillment centers.

The court is also not persuaded by defendant's reliance on the Second Circuit's decision in *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 593–94 (2d Cir. 2007) because the facts alleged in plaintiffs' SAC are more similar to the facts presented in *Steiner*, 350 U.S. at 247.  In *Steiner*, the Supreme Court held that the time battery-plant employees spent showering and changing clothes because the chemicals in the plant were toxic to human beings was compensable.  *Id.* at 251.  In *Gorman*, the Second Circuit concluded that time spent undergoing security screenings at the entry of a nuclear power plant was not integral and indispensable to the work of the plant's employees.  *Id.*  However, the court in *Gorman* recognized that the Supreme Court's decision in *Steiner* "supports the view that when work is done in a lethal atmosphere, the measures that allow entry and immersion into the destructive element may be integral to all work done there[.]"  *Id.* at 593.  Here, the COVID-19 virus has allegedly rendered warehouses where hundreds of employees gather to work into facilities much more akin to the workplace at issue in *Steiner*, where toxic substances "permeated the entire [battery] plant and everything and everyone in it."  *Steiner*, 350 U.S. at 250–51.  Moreover, the decision in *Gorman* is inapplicable here for

1    several other reasons.  First, in *Gorman* the circuit court acknowledged that the Ninth Circuit

2    applied a more lenient standard than the Second Circuit in determining what work qualified as

3    "integral and indispensable."  *Gorman*, 488 F.3d at 594 (citing *Alvarez*, 339 F.3d at 903) (finding

4    that doffing non-unique gear was integral and indispensable).  Second, "[t]he Second Circuit, in

5    contrast to other federal circuit courts, interprets the phrase 'integral and indispensable' extremely

6    narrowly."  *Adams v. Alcoa, Inc.*, 822 F. Supp. 2d 156, 161–63 (N.D.N.Y. 2011) (citing *Gorman*,

7    488 F.3d at 594).  In the present case, construing the allegations of the SAC in the light most

8    favorable to plaintiffs, as it must, the court concludes that plaintiffs have adequately alleged that

9    defendant's COVID-19 screenings were an integral and indispensable part of their principal

10   activities as employees at the fulfillment centers.

11                     c.     *Whether Time Spent in COVID-19 Screenings Is De Minimis*

12          In order for time to be considered compensable under the FLSA, plaintiffs must

13   eventually show that the time spent in COVID-19 screenings is more than *de minimis*.  *See Ceja-*

14   *Corona*, 2013 WL 796649, at *7.  In determining whether otherwise compensable time is *de*

15   *minimis*, the Ninth Circuit considers three factors:  "(1) the practical administrative difficulty of

16   recording the additional time; (2) the aggregate amount of compensable time; and (3) the

17   regularity of the additional work."  *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984).

18   In *Lindow* the Ninth Circuit held that "there is no precise amount of time and no rigid rule that

19   can be applied with mathematical certainty" in making a *de minimis* finding.  *Ceja-Corona*, 2013

20   WL 796649, at *4 (citing *Lindow*, 738 F.2d at 1062).  However, "the *Lindow* court cited

21   numerous other courts that held that an additional daily period of approximately 10 minutes is

22   considered *de minimis* even though otherwise compensable."  *Id.*  More importantly, however, for

23   purposes of resolving the pending motion, courts have determined that the *de minimis* rule is an

24   affirmative defense that is generally inappropriate for resolution by way of a motion to dismiss

25   brought pursuant to Rule 12(b)(6).  *See, e.g.*, *Mitchell v. Acosta Sales, LLC*, No. 11-cv-1796-

26   GAF, 2011 WL 13309051, at *10 (C.D. Cal. June 9, 2011) (To survive a motion to dismiss, a

27   plaintiff "is not bound to affirmatively allege facts showing that the time worked was more than

28   de minimis, as [defendant] bears the burden to show that the time was merely de minimis.");

1    *Walden v. Nevada ex rel. Nevada Dep't of Corrs.*, No. 3:14-cv-00320-MMD-WGC, 2018 WL

2    1472715, at *8 (D. Nev. Mar. 26, 2018) ("The Court, however, does not quibble about the

3    plausibility of facts when doing so would require this Court to look at evidence outside the

4    pleadings . . . . The Court therefore finds that the FAC's allegations permit this Court to make the

5    reasonable inference that these activities, as alleged, are not *de minimis*."); *Whitaker v.*

6    *Countrywide Fin. Corp.*, No. 09-cv-5898-CAS-PJW, 2010 WL 4537098, at *3 n.1 (C.D. Cal.

7    Nov. 1, 2010) (finding with respect to defendant's *de minimis* argument that it "would be more

8    properly addressed on a summary judgment motion after consideration of a factual record based

9    on which it could make the appropriate factual findings.").[4]

10        Notably, plaintiffs have alleged that "[t]he amount of time it takes to undergo the COVID-

11    19 examination is approximately 10 minutes to 15 minutes on average" but "[t]his amount of time

12    could be longer depending upon the number of other Amazon employees in line for the COVID-

13    19 screening." (SAC at ¶ 34.)  Plaintiffs also allege that the screenings took place every day and

14    were therefore regular.  (*Id.* at ¶ 28.)  Although close to the ten-minute standard referred to in

15    *Lindow*, the undersigned concludes that at the pleading stage, where the court considers all of the

16    allegations in the light most favorable to the non-moving party, plaintiffs' allegations in this

17    regard are sufficient to survive the pending motion to dismiss.  This conclusion is bolstered by the

18    directive that "courts should consider the size of the aggregate claim as courts 'have granted relief

19    for claims that might have been minimal on a daily basis, but, when aggregated, amounted to a

20    substantial claim.'" *Ceja-Corona*, 2013 WL 796649, at *4 (citing *Lindow*, 738 F.2d at 1063).

21        For these reasons, the court concludes that plaintiffs have sufficiently alleged that the time

22    spent in the COVID-19 screenings was not *de minimis*.  Accordingly, the court now turns to

23    whether plaintiffs have sufficiently alleged that defendant has failed to pay overtime in violation

24    of the FLSA and the California Labor Code.

25    /////

26

27

28

---

[4]  Any factual challenge to whether the time spent by Amazon employees in the COVID-19 screenings was *de minimis* is more appropriately addressed on summary judgment or at trial.  In that same vein, any arguments as to the practical administrative difficulty of recording the additional time so spent are also more appropriately addressed at a later stage of this litigation.

2.      Whether Plaintiffs Have Sufficiently Alleged a Claim for Unpaid Overtime

"[A] plaintiff asserting a claim to overtime payments must allege that she worked more than forty hours in a given workweek without being compensated for the overtime hours worked during that workweek." *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 641 (9th Cir. 2014). "Because the employee in *Landers* simply alleged that he was not paid for overtime hours, without providing details about the overtime hours worked, his allegations merely 'raise[d] the possibility' of undercompensation[.]" *Daugherty v. SolarCity Corporation*, No. 16-cv-05155-WHA, 2017 WL 386253, at *4 (N.D. Cal Jan. 26, 2017).  This pleading standard applies to both plaintiffs' FLSA and state law claims for unpaid overtime.  *See Tan v. Grubhub, Inc.*, 171 F. Supp. 3d 998, 1007 n.3 (N.D. Cal. 2016) ("[A]lthough *Landers* discussed overtime claims asserted under the FLSA, its reasoning applies to overtime claims asserted under the California Labor Code, as well.").

The parties disagree over the application of *Landers* in this case.  The undersigned has previously recognized that the question as to how strictly *Landers* should be applied has been the source of some disagreement among district courts.  *See Tavares v. Cargill Inc.*, No. 1:18-cv-00792-DAD-SKO, 2019 WL 2918061, at *3 (E.D. Cal. July 8, 2019) (collecting cases). Defendant argues that plaintiffs have not satisfied the applicable pleading standard for overtime claims because they "fail to allege the hours they worked and the overtime they claim they are owed with the level of specificity required by *Landers*."  (Doc. No. 24 at 27.)  Specifically, defendant contends that plaintiffs have neither alleged a single particular workweek in which they worked overtime, nor have they alleged the amount of overtime wages they believe they are owed.  (*Id.* at 28) (citing *Nicolas v. Uber*, No. 19-cv-08228-PJH, 2021 WL 2016161, at *9 (N.D. Cal. May 20, 2021) (dismissing overtime claims where the plaintiffs failed to allege overtime weeks worked with the required specificity)).  Plaintiffs, in contrast, argue that *Landers* does not require them to identify an exact calendar week of denied overtime; rather, their "allegations need only give rise to a plausible inference that such an instance exists."  (Doc. No. 28 at 26) (quoting *Tan*, 2016 WL 3743365).

/////

23

1    Both plaintiffs have alleged that they each worked 40 hours a workweek, not including

2 the time spent in COVID-19 screening at Amazon.  Plaintiff Boone alleged that she worked four

3 days a week for 10 hours each day, from 7:45 a.m. to 5:45 p.m., and plaintiff Rivera has alleged

4 that she worked from 6:00 p.m. to 5:00 a.m. on four consecutive days, followed by three days off.

5 (SAC at ¶¶ 26, 27.)  Thus, factoring in the alleged unpaid COVID-19 screening time, both

6 plaintiffs have not only alleged that defendant failed to pay adequate overtime wages earned on at

7 least one workweek, plaintiffs' allegations "support the inference that [defendant] *typically* failed

8 to pay adequate overtime wages."  *Daugherty*, 2017 WL 386253, at *5; *cf. Tavares*, 2019 WL

9 2918061, at *4 ("The conclusory allegation that plaintiff and others worked overtime does not

10 allege any facts—such as the typical work schedule or the approximate number of hours worked

11 during any given period—that could plausibly support a claim for unpaid overtime.").  In sum,

12 plaintiffs have provided allegations addressing their start and end dates of employment, their

13 hourly rates of pay, and their work schedules.  (SAC at ¶¶ 26, 27.)  Plaintiffs' allegations

14 therefore "provide 'sufficient detail about the length and frequency of [their] unpaid work to

15 support a reasonable inference that [they] worked more than forty hours in a given week.'"

16 *Landers*, 771 F.3d at 646 (quoting *Nakahata v. New York–Presbyterian Healthcare Sys., Inc.*, 723

17 F.3d 192, 201 (2d Cir. 2013)).

18    Accordingly, defendant's motion to dismiss plaintiffs' sixth claim for unpaid overtime in

19 violation of the FLSA and second claim for unpaid overtime in violation of California law will be

20 denied.

21 **C.    Whether Plaintiffs Have Sufficiently Alleged Their Wage Statement Claim (Claim**

22 **Three)**

23    Defendant next argues that plaintiffs' third claim for failure to provide itemized wage

24 statements in violation of California Labor Code § 226 should be dismissed both because

25 plaintiffs lack standing to bring the claim and because plaintiffs have not sufficiently alleged facts

26 to support the essential elements of such a claim.

27 /////

28 /////

24

1          1.      Whether Plaintiffs Alleged Standing to Bring Their Wage Statement Claim

2          "[I]n order to satisfy Article III's standing requirement, a plaintiff seeking damages for the

3  violation of a statutory right must not only plausibly allege the violation but must also plausibly

4  allege a 'concrete' injury causally connected to the violation." *Dutta v. State Farm Mut. Auto.*

5  *Ins. Co.*, 895 F.3d 1166, 1172 (9th Cir. 2018).  Defendant argues that plaintiffs lack Article III

6  standing to bring their third claim for failure to provide itemized wage statements because they

7  have failed to allege an injury-in-fact.  (Doc. No. 24 at 28.)

8          The Ninth Circuit has recognized that "§ 226(a) protects employees' concrete interest in

9  receiving accurate information about their wages in their pay statements." *Magadia v. Wal-Mart*

10 *Assocs.*, 999 F.3d 668, 679 (9th Cir. 2021).  An employer violates that statute if it "fails to

11 provide accurate and complete information" required by § 226(a), and if "the employee cannot

12 promptly and easily determine [that information] from the wage statement alone."  Cal. Lab.

13 Code § 226(e)(2)(B).  Further, § 226 was amended in 2013 to provide a presumption of injury

14 when certain categories of information are omitted from an employee's wage statement.  *See*

15 *Fodera v. Equinox Holdings, Inc.*, No. 19-cv-05072-WHO, 2020 WL 3961985, at *3 (N.D. Cal.

16 July 13, 2020).  In *Maldonado v. Epsilon Plastics, Inc.*, 22 Cal. App. 5th 1308 (2018), the

17 California Court of Appeal clarified which categories of missing information are entitled to a

18 presumption of injury.  In that case the state appellate court "analyzed the statutory language of

19 section 226, drawing a distinction between the term 'earned' and the term 'worked.'" *Fodera*,

20 2020 WL 3961985, at *4 (citing *Maldonado*, 22 Cal. App. 5th at 1336).  The plaintiffs in

21 *Maldonado* argued that their wage statements did not properly designate as overtime the ninth

22 and tenth hours that they worked.  *Maldonado*, 22 Cal. App. 5th at 1312.  In other words, the

23 plaintiffs in that case argued that although their wage statements listed all the hours they had

24 worked, the statements failed to properly show which hours were earned overtime.  The state

25 appellate court in *Maldonado* held that plaintiffs cannot maintain a claim under §226(a) based on

26 additional wages owed if the wage statement at issue reflects the accurate amount of hours

27 worked.  *See Maldonado*, 22 Cal. App. 5th at 1336–37.  The court explained in this regard that

28 "failure to pay overtime at the appropriate rate" does not also generate "a wage statement injury

justifying the imposition of wage statement penalties," otherwise "an apparent unintentional double recovery" would result. *Id.* at 1336. Therefore, the court concluded "that only the absence of the *hours worked* will give rise to an inference of injury; the absence of accurate *wages earned* will be remedied by the violated wage and hours law itself." *Id.* at 1337 (emphasis in original).

The allegations advanced by plaintiffs in their SAC are significantly different from those in *Maldonado*. Here, plaintiffs alleged that the time they spent in COVID-19 screening at work was not counted as hours worked at all on their wage statements, let alone hours for which they were compensated. "This is precisely the type of section 226 claim that [the] *Maldonado* court approved of because it does not run into the problem of double recovery; rather, it would be entitled to an inference of injury pursuant to subdivision (e)(2)(B)(i)." *Fodera*, 2020 WL 3961985, at *5; *see also Reyna v. WestRock Co.*, No. 20-cv-01666-BLF, 2020 WL 5074390, at *10 (N.D. Cal. Aug. 24, 2020) (concluding that *Maldonado* did not apply because plaintiff alleged an absence of actual hours worked reflected on the wage statements as opposed to the rate of pay for all hours); *Bates v. Leprino Foods Co.*, No. 2:20-cv-00700-AWI-BAM, 2020 WL 6392562, at *7 (E.D. Cal. Nov. 2, 2020) (same). Here, in contrast to *Maldonado*, and similar to *Fodera*, *Reyna*, and *Bates*, plaintiffs have specifically alleged in their SAC that Amazon failed to furnish plaintiffs with timely, itemized wage statements that accurately reflect "the total number of hours worked, hourly rates, and wages earned" in violation of § 226(a). (SAC at ¶ 103.) This "information is required under § 226(a)(2) and (a)(9) and entitled to a presumption of injury under § 226(e)(2)(B)(i)." *Bates*, 2020 WL 6392562, at *7. Plaintiffs therefore do have standing to bring their § 226(a) claim for failure to furnish wage statements and defendant's motion to dismiss the claim on that basis will be denied.

2.      Whether Plaintiffs Allege the Essential Elements of Their Wage Statement Claim

Defendant also argues that "the [SAC] lacks any factual assertions to support Plaintiffs' claims that Amazon knowingly and intentionally failed to provide accurate wage statements, an essential element of a claim under section 226." (*Id.*)

/////

26

"[T]o satisfy the 'knowing and intentional' requirement [of a wage statement claim], a plaintiff 'need only plead that defendants knew of the facts underlying the alleged violation, and need not plead that defendants had knowledge that their alleged actions were unlawful.'" *Perez v. Performance Food Group, Inc.*, No. 15-cv-02390-HSG, 2016 WL 1161508, at *4 (N.D. Cal. Mar. 23, 2016) (quoting *Contreras v. Performance Food Grp., Inc.*, No. 14-cv-03380-PJH, 2014 WL 6481365, at *3 (N.D. Cal. Nov. 18, 2014)).

Here, plaintiffs allege that Amazon "knowingly and intentionally failed to furnish and continues to fail to furnish Plaintiffs and each California Class Member with timely, itemized wage statements[.]" (SAC at ¶ 103.)  In general, courts have found this type of allegation to be sufficient.  *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *Perez*, 2016 WL 1161508, at *3 (allegation that defendants knew wage statements did not comply with § 226 was adequate to withstand motion to dismiss); *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 811 (N.D. Cal. 2015) ("A simple allegation that an employer's failure to provide accurate wage statements was 'knowing and intentional' suffices to state a claim under section 226.") (citing *Reinhardt v. Gemini Motor Transp.*, 879 F. Supp. 2d 1138, 1142 (E.D. Cal. 2012) ("[T]he FAC expressly states that [defendant]'s failure to comply with § 226 was 'knowing and intentional.' [] Because mental states may be alleged generally, Plaintiffs have adequately alleged 'knowing and intentional' conduct by [defendant.]")).  Accordingly, defendant's motion to dismiss plaintiffs' third claim for failure to furnish wage statements will be denied.

**D.      Whether Plaintiffs State a Claim for Waiting Time Penalties (Claim Four)**

Plaintiffs' fourth claim for relief is for failure to pay all wages upon separation from employment in violation of California Labor Code §§ 201, 202, 203, and 218.  (SAC at 18.)  "If an employer 'willfully fails to pay' in accordance with Sections 201 or 202, the employer is subject to statutory penalties; known as 'waiting time' penalties."  *Dawson v. Hitco Carbon Composites, Inc.*, No. 16-cv-7337-PSG (FFMx), 2017 WL 7806358, at *4 (C.D. Cal. May 5, 2017) (citing Cal. Lab. Code § 203(a)).

/////

27

1    "Under Labor Code section 203, a 'willful failure to pay wages . . . occurs when an

2    employer intentionally fails to pay wages to an employee when those wages are due.'" *Diaz v.*

3    *Grill Concepts Services, Inc.*, 23 Cal. App. 5th 859, 869 (2018) (quoting Cal. Code Regs. tit.8,

4    § 13520).  An employer's failure to pay is not willful if that failure is due to (1) uncertainty in the

5    law, (2) representation by taxing authority that no further payment was required, or (3) the

6    employer's good faith mistaken belief that wages are not owed grounded in a good faith dispute,

7    which exists when the employer presents a defense, based in law or fact which, if successful,

8    would preclude any recovery on the part of the employee.  *Id.*

9    Similar to its arguments with respect to plaintiffs' wage statement claim, defendant argues

10   that plaintiffs have offered mere conclusory allegations that Amazon "knowingly" and "willfully"

11   failed to pay wages in violation of §§ 201 and 202, "even though [knowing and willful failure to

12   pay] is an essential element of a claim for waiting time penalties under section 203."  (Doc. No.

13   24 at 30.)  At the very least, defendant asserts, "the claims brought in the [SAC] are plainly

14   subject to good faith disagreement."  (*Id.*) (citing Cal. Code. Regs. tit. 8, § 13520).  Defendant

15   therefore argues that plaintiffs' fourth claim for failure to provide wages upon separation of

16   employment should be dismissed.

17   In opposition, plaintiffs argue that "Amazon admits that it was aware of the opinion issued

18   by the DIR stating that the time spent by workers completing COVID-19 screenings should be

19   paid by employers" and that Amazon's disregard of that authority demonstrates that Amazon

20   acted willfully.  (Doc. No. 28 at 31.)

21   As an initial matter, for the same reasons articulated above with respect to plaintiffs' wage

22   statement claim, the court does not find persuasive defendant's argument that plaintiffs'

23   allegations regarding the "knowing and willful" elements are conclusory.  On the other hand,

24   defendant's argument that it did not act willfully because of "uncertainty in the law" is not wholly

25   unpersuasive.  Nevertheless, the undersigned again concludes that this issue is more suitable for

26   post-discovery resolution.  The majority of courts to address the "good faith dispute" defense

27   have done so at the summary judgment stage of the litigation.  *See, e.g.*, *Ornelas v. Tapestry, Inc.*,

28   No. 18-cv-06453-WHA, 2021 WL 2778538, at *9 (N.D. Cal. July 2, 2021) (granting defendant's

1    motion for summary judgment because defendant raised a "good faith dispute as to whether it

2    acted 'willfully' . . . in its alleged failure to adequately compensate plaintiff in a timely manner");

3    *Utne v. Home Depot U.S.A., Inc.*, No. 16-cv-01854-RS, 2019 WL 3037514, at *5 (N.D. Cal. July

4    11, 2019) (granting defendant's motion for summary judgment because defendant pointed to "no

5    evidence of bad faith aside from the parties' conflicting interpretations of [defendant's] policy");

6    *Garcia v. Tapestry, Inc.*, No. 18-cv-1537-DMG (SHKx), 2019 WL 12105505, at *11 (C.D. Cal.

7    May 20, 2019) (same); *see also Powell v. Walmart Inc.*, No. 3:20-cv-2412-BEN-LL, 2021 WL

8    369550, at *3 (S.D. Cal. Feb. 3, 2021) ("To be sure, Plaintiffs will have to prove willfulness with

9    evidence later in this litigation, but at this point, they have plausibly pleaded the element to

10   survive this Motion to Dismiss.")

11        Because asserted defenses that are "unsupported by any evidence" do not present a good

12   faith dispute, the court deems this issue more appropriate for resolution by post-pleading motions

13   involving the submission of evidence as to whether defendant in fact was uncertain regarding the

14   state of the applicable law.  *See Diaz*, 23 Cal. App. 5th at 873–74 (finding that the good faith

15   defense excludes defenses that are unsupported by evidence).

16        Accordingly, defendant's motion to dismiss plaintiffs' fourth claim for failure to pay all

17   wages upon separation from employment will be denied. [5]

18   **E.    Plaintiffs' UCL Claim (Claim Five)**

19        California's UCL prohibits "any unlawful, unfair, or fraudulent business act or practice."

20   Cal. Bus. & Prof. Code § 17200.  "Each prong of the UCL is a separate and distinct theory of

21   liability."  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009).  Here, plaintiffs' UCL

22   claim is based on their allegations that defendant engaged in "unlawful" and "unfair" business

23   practices.  (SAC at ¶ 116.)

24   /////

25   _____

26   [5]  The parties agree that plaintiffs' PAGA claims are dependent upon and derivative of the Labor
     Code violations asserted in claims one through four.  (Doc. No. 35 at 2.)  Therefore, because the

27   court concludes that the asserted Labor Code violations have been sufficiently alleged, so too
     have the PAGA claims.  As a result, defendant's motion will also be denied to the extent it seeks

28   dismissal of plaintiffs' PAGA claims.

"The only monetary remedy available in a private action under the unfair competition law is restitution." *Clark v. Superior Court*, 50 Cal. 4th 605, 613 (2010); *see also Calhoun v. Google LLC*, No. 20-cv-05146-LHK, 2021 WL 1056532, at *22 (N.D. Cal. Mar. 17, 2021). The Ninth Circuit has held that to secure equitable restitution for past harm under the UCL, plaintiffs must establish that they otherwise lack an adequate remedy at law. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).

With respect to plaintiffs' UCL claim, defendant argues that the claim is entirely derivative of their other claims for relief. Moreover, defendant contends that plaintiffs "cannot pursue relief pursuant to the UCL because they expressly claim entitlement to numerous remedies at law and make no allegations that those remedies are inadequate." (Doc. No. 34 at 31.) On this basis, defendant seeks dismissal of plaintiffs' fifth claim for unlawful and/or unfair competition in violation of the UCL.

In terms of relief on their UCL claim, plaintiffs seek "all wrongfully withheld wages, including, but not limited to minimum wages and overtime compensation." (SAC at ¶ 117.) The court interprets this prayer for relief as plaintiffs seeking equitable restitution under the UCL, given that is the only monetary remedy available. However, plaintiffs do not allege that they lack an adequate remedy at law as required, *see Sonner*, 971 F.3d at 844, or "distinguish their request for restitution from their request for damages," *TopDevz, LLC v. LinkedIn Corp.*, No. 20-cv-08324-SVK, 2021 WL 3373914, at *5 (N.D. Cal. Aug. 3, 2021). Accordingly, because plaintiffs have failed to allege that they lack an adequate remedy at law, their UCL claim is subject to dismissal. Plaintiffs do request that the court grant them leave to amend their SAC. (Doc. No. 28 at 31.) "Courts are free to grant a party leave to amend whenever 'justice so requires,' and requests for leave should be granted with 'extreme liberality.'" *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009). The court will therefore grant plaintiffs leave to amend their complaint with respect to their UCL claim. However, plaintiffs are cautioned to do so only if they can in good faith allege facts curing the noted deficiency with respect to this claim.

/////

/////

1

**CONCLUSION**

2          For all of the reasons set forth above:

3      1.      The court denies in part and grants in part defendant's motion to dismiss (Doc. No.

4              24);

5              a.      The court grants defendant's motion to dismiss plaintiffs' fifth claim for

6                      violation of the UCL, with leave to amend; and

7              b.      Defendant's motion to dismiss is otherwise denied;

8      2.      Any third amended complaint, or notice of an intent to proceed on the remaining

9              claims as alleged in the SAC, shall be filed within twenty-one (21) days from the

10             issuance of this order.

11     IT IS SO ORDERED.

12         Dated:   __**March 11, 2022**__                    _____

13                                                       UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31